UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JUDAH NATHANSON, on behalf of himself and all others similarly situated, | **Case No.  1:15-CV-4101** |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT** |
| | **DEMAND FOR JURY TRIAL** |
| AMERICAN AIRLINES, INC; DELTA AIR LINES, INC.; SOUTHWEST AIRLINES CO.; and UNITED AIRLINES, INC., | |
| Defendants. | **FILED VIA ECF** |

Plaintiff, on behalf of himself and all others similarly situated (the "Class"), brings this action for damages under the federal antitrust laws against defendants American Airlines, Inc., Delta Air Lines, Inc., Southwest Airlines Co., and United Airlines, Inc. (collectively "Defendants") arising from a conspiracy to raise, fix, stabilize, or maintain prices for domestic air passenger transportation services in the United States from July 1, 2011, through the present (the "Class Period").  Plaintiff demands a trial by jury and alleges as follows:

## I.   NATURE OF THE CASE

1.      This lawsuit is brought as a class action on behalf of plaintiff and all individuals and entities in the United States who purchased domestic air passenger transportation services directly from one or more Defendants or their affiliates during the Class Period.

## II.   JURISDICTION AND VENUE

2.      Plaintiff and the Class bring this action under Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover damages, including treble damages, for the injuries sustained by plaintiff and the Class resulting from violations by Defendants of Sherman Act § 1, 15 U.S.C. § 1.

3.      This Court has jurisdiction over the subject matter of this action pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a), and 28 U.S.C. §§ 1331 and 1337.

4.      Defendants engaged in conduct that caused direct, substantial, and reasonably foreseeable and intended anti-competitive effects upon interstate commerce within the United States during the Class Period.

5.      Venue is proper in this district pursuant to Sections 4(a) and 12 of the Clayton Act, 15 U.S.C. §§ 15(a) and 22, and 28 U.S.C. §§ 1391 (b), (c), and (d), because a substantial part of the events giving rise to plaintiff's claims occurred in this district, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this district, and one or more of the Defendants reside, are licensed to do business in, are doing business in, had agents in, or are found or transact business in this district.

6.      This Court has *in personam* jurisdiction over each of the Defendants because, *inter alia*, each Defendant: (a) transacted business in the United States, including in this district; (b) directly or indirectly sold or marketed substantial quantities of domestic air passenger transportation services throughout the United States, including in this district; (c) had substantial aggregate contacts with the United States as a whole, including in this district; or (d) was engaged in an illegal price-fixing conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to, the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this district.

7.      The activities of Defendants and their co-conspirators were within the flow of, were intended to, and did have, a substantial effect on interstate commerce of the United States.

### III.   PARTIES

#### A.   Plaintiff

8.     Plaintiff Judah Nathanson is a citizen of the State of New York, is over the age of 18, and is otherwise *sui juris*. Plaintiff is a resident of New York County, New York. During the Class Period, plaintiff purchased air passenger transportation services directly from one or more Defendants and has been injured by reason of the antitrust violations alleged in this complaint.

#### B.   Defendants

9.     Defendant American Airlines, Inc. ("American") is a domestic corporation with its principal place of business located at 4333 Amon Carter Boulevard, Fort Worth, Texas 76155. American conducts air passenger transportation services throughout the United States, including flights to and from this district.

10.    Defendant Delta Air Lines, Inc. ("Delta") is a domestic corporation with its principal place of business located at 1030 Delta Boulevard, Atlanta, Georgia 30354. Delta conducts air passenger transportation services throughout the United States, including flights to and from this district.

11.    Defendant Southwest Airlines Co. ("Southwest") is domestic corporation with its principal place of business located at 2702 Love Field Drive, Dallas, Texas 75235. Southwest conducts air passenger transportation services throughout the United States, including flights to and from this District.

12.    Defendant United Airlines, Inc. ("United") is a domestic corporation with its principal place of business located at 233 S. Wacker Drive, Chicago, Illinois 60606. United conducts air passenger transportation services throughout the United States, including flights to and from this district.

13.     Defendants and their co-conspirators, directly and through their affiliates, sold domestic air passenger transportation services in the United States at artificially inflated prices during the Class Period.

### IV.     AGENTS AND CO-CONSPIRATORS

14.     Each Defendant acted as the principal of or agent for other Defendants with respect to the acts, violations, and common course of conduct in this complaint.

15.     Various other persons, firms, and corporations not named as Defendants have participated as co-conspirators with the Defendants and have performed acts and made statements in furtherance of the conspiracy or in furtherance of the anti-competitive conduct.

16.     Whenever this Complaint refers to any act, deed, or transaction of any corporation or limited liability entity, that allegation means that the corporation or limited liability entity engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's or limited liability entity's business or affairs.

### V.     INTERSTATE TRADE AND COMMERCE

17.     Defendants are the leading providers of domestic air passenger transportation services in the United States.

18.     During the Class Period, Defendants or one or more of their affiliates sold domestic air passenger transportation services throughout the United States in a continuous and uninterrupted flow of interstate commerce, including through and into this judicial district.

19.     Defendants' activities, including the marketing and sale of domestic air passenger transportation services, have taken place within, and have had and were intended to have a direct,

substantial, and reasonably foreseeable anti-competitive effect upon, interstate commerce within the United States.

20.     The restraints alleged in this complaint have directly and substantially affected interstate commerce in that Defendants have deprived plaintiff and the Class of the benefits of free and open competition in the purchase of domestic air passenger transportation services throughout the United States.

21.     Defendants' agreement to inflate, fix, raise, maintain, or artificially stabilize prices of domestic air passenger transportation services and their actual inflating, fixing, raising, maintaining, or artificially stabilizing those prices was intended to and had a direct, substantial and reasonably foreseeable effect on United States commerce.

## VI.     CLASS ACTION ALLEGATIONS

22.     Plaintiff brings this action on behalf of himself and, pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3), as representative of a Class defined as follows:

> All persons or entities (but excluding Defendants, their officers, directors, and employees, as well as Defendants' parents, predecessors, successors, subsidiaries, affiliates) who purchased domestic air passenger transportation services in the United States, its territories or possessions, directly from any Defendant, or from any of their parents, predecessors, successors, subsidiaries, or affiliates, at any time during the period from and including July 1, 2011, to the present.

23.     Members of the Class are so numerous and geographically dispersed across the United States that joinder is impracticable. While the exact number of Class members is unknown to plaintiff, it is believed to be in the tens of thousands and geographically dispersed throughout the United States. The Class is readily identifiable from information and records in possession of the Defendants.

24.     Plaintiff's claims are typical of the claims of the Class. Plaintiff and the Class were damaged by the same wrongful conduct by the Defendants, that is, they have paid

artificially inflated prices for domestic air passenger transportation services as a result of Defendants' anti-competitive and unlawful conduct.

25.     Plaintiff is a member of the Class and will fairly and adequately protect and represent the interests of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the Class.

26.     Plaintiff is represented by counsel who are experienced and competent in the prosecution of class action antitrust litigation.

27.     Questions of law and fact common to the Class predominate over questions, if any, that may affect only individual Class members because Defendants have acted on grounds generally applicable to the entire Class. Such generally applicable conduct is inherent in Defendants' anti-competitive and unlawful conduct.

28.     Questions of law and fact common to the Class include, but are not limited to:

a.     Whether the Defendants combined, agreed, or conspired to fix, raise, maintain, or stabilize the prices of domestic air passenger transportation services sold in the United States;

b.     The existence, extent, and duration of the illegal contract, combination, or conspiracy alleged herein;

c.     Whether the contract, combination, or conspiracy caused prices of domestic air passenger transportation services to be higher than they would have been in the absence of Defendants' conduct;

d.     Whether Defendants' conduct caused the prices of domestic air passenger transportation services sold in the United States to be at artificially high and non-competitive levels;

e.     Whether plaintiff and other members of the Class were injured by the Defendants' conduct;

f.     Whether Defendants' conduct violated Section 1 of the Sherman Act; and

g.     The appropriate measure of the damages suffered by Class members.

29.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all damaged Class members is impractical. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, effectively, and without the duplication of effort and expense that numerous individual actions would engender. Prosecution as a class action will eliminate the possibility of repetitive litigation. Class treatment will permit the adjudication of relatively small claims by Class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this litigation. Thus, absent the availability of a class action, it would not be feasible for Class members to redress the wrongs done to them.

30.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications.

31.     There will be no material difficulty in the management of this action as a class action.

## VII.    FACTUAL ALLEGATIONS

### A.    Background

32.     The domestic airline industry in the United States includes passenger flights between the 50 states, District of Columbia, Puerto Rico, and the Virgin Islands. In 2014, over 662 million passengers travelled within the United States on more than 8 million flights generating $145.8 billion in revenue for United States carriers.

33.     The United States airline industry is dominated by "legacy airlines," which are airlines that established routes prior to the Airline Deregulation Act of 1978. Legacy airlines have included Southwest, American, U.S. Airways, Delta, Northwest Airlines, United, and Continental Airlines.

34.     Since 2005, the United States airline industry has undergone significant consolidation and four legacy airlines – American, United, Delta, and Southwest – now dominate the industry with approximately 70% combined market share. In 2008, Delta and Northwest merged. In 2010, United and Continental merged. In 2011, Southwest and AirTran merged. In 2014, American and U.S. Airways merged, creating the largest airline in the world.

35.     The chart below shows the percentage of revenue passenger miles (RPM), the number of miles flown by fare-paying passengers, by legacy and other airlines since 2005:

**Table 1: Domestic Airline Carrier Shares of Revenue Passenger Miles**

|  | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|---|---|
| **American** | 16% | 15% | 15% | 14% | 14% | 14% | 13% | 13% | 13% | 20% |
| **US Airways** | 5% | 5% | 5% | 8% | 8% | 8% | 8% | 8% | 8% | |
| **Delta** | 13% | 11% | 11% | 11% | 11% | 17% | 16% | 16% | 16% | 17% |
| **Northwest** | 7% | 7% | 7% | 6% | 6% | | | | | |
| **United** | 12% | 12% | 12% | 11% | 11% | 10% | 9% | 16% | 16% | 15% |
| **Continental** | 7% | 8% | 8% | 8% | 8% | 7% | 7% | | | |
| **Southwest** | 11% | 12% | 12% | 13% | 14% | 14% | 15% | 15% | 16% | 17% |
| **Other** | 29% | 30% | 31% | 29% | 29% | 30% | 31% | 32% | 31% | 31% |
| **Legacy Totals** | 71% | 70% | 69% | 71% | 71% | 70% | 69% | 68% | 69% | 69% |

36.     The structure of the industry is conducive to coordinated behavior.

37.     The industry is dominated by a small, shrinking group of firms, which means that a cartel can be more easily found and maintained over time.

38.     There are high barriers to entry due to government regulations restricting access to airports and gates, large capital requirements for technology and equipment, and the nature of

the ticketing and reservation system, which means existing firms can raise prices above competitive levels and earn above-normal levels of profits.

39.     All airlines have complete, accurate, and real-time access to every detail of every airline's published fare structure on every route through the airline-owned Airline Tariff Publishing Company ("ATPCO"). US Airways' management has called ATPCO "a dedicated price-telegraph network for the industry." The airlines use ATPCO to monitor and analyze each other's fares and fare changes, and implement strategies designed to coordinate pricing. Airlines have previously used ATPCO to engage in coordinated behavior. In 1992, the United States filed a lawsuit to stop several airlines from using their ATPCO filings as a signaling device to facilitate agreements on fares. That lawsuit resulted in a consent decree, now expired.

40.     Airlines watch each other's fares and match each other's fare increases and ancillary fees. "Cross-market initiatives" or "CMIs" deter aggressive discounting and prevent fare wars. A CMI occurs where two or more airlines compete on multiple routes. If an airline offers discounted fares in one market, an affected competitor often responds with discounts in another market—a CMI—where the discounting airline prefers a higher fare. CMIs often cause an airline to withdraw fare discounts. For example, in the fall of 2009, US Airways lowered fares and relaxed restrictions on flights out of Detroit (a Delta stronghold) to Philadelphia. Delta responded by offering lower fares and relaxed restrictions from Boston to Washington (a US Airways stronghold). US Airways' team lead for pricing observed Delta's move and concluded, "We have more to lose in BOSWAS . . . I think we need to bail on the [Detroit-Philadelphia] changes." US Airways then "bailed."

**B.     Defendants Agreed to Reduce Output Through  "Capacity Discipline"
Resulting in Higher Fares and Fees for Passengers**

41.     Defendants agreed to reduce output—that is, capacity—by restraining growth in or reducing established service. This "capacity discipline" has resulted in fewer flights, higher fares, and higher ancillary fees. During the Class Period, Defendants confirmed their adherence to this "capacity discipline."

**Delta:**

42.     On December 14, 2011, Delta's CEO, Richard Anderson, stated, "The capacity discipline is a really important metric for us and will continue."

43.     On July 25, 2012, Mr. Anderson stated, "Capacity discipline is our key lever. We will continue to actively manage our capacity."

44.     On April 23, 2013, Mr. Anderson stated, "Capacity discipline [has] built a strong permanent revenue producing foundation for Delta with the eighth consecutive quarter of a year-on-year revenue premium."

45.     On October 22, 2013, Delta's President, Ed Bastian, stated, "Rest assured that our commitment to maintaining strong capacity discipline remains in place."

46.     On July 23, 2014, Mr. Anderson stated, "As we look forward to the remainder of 2014 and beyond, Delta will continue to maintain the steady course we have been on, especially our disciplined approach to capacity levels. This discipline continues to be a key driver of our success, as we will post record results for 2014."

47.     On April 15, 2015, Mr. Anderson stated, "We will continue to be disciplined with our domestic capacity levels, with our domestic growth driven by higher gauge and fewer total airplanes, which will cause us to improve efficiency and drive higher operating margins."

**United:**

48.      On July 26, 2012, United's Executive Vice President and Chief Revenue Officer, Jim Compton, stated, "We remain committed to capacity discipline to generate sustained and sufficient profitability."

49.      On April 25, 2013, Mr. Compton stated, "Capacity discipline remains a key tenant of our strategy."

50.      On January 23, 2014, Mr. Compton stated, "Let me assure you that we will continue to be disciplined in how and where we deploy capacity."

51.      On October 23, 2014, Mr. Compton stated, "Continued capacity discipline has supported the consistent unit revenue growth in the last several quarters and we expect domestic strength to continue into the fourth quarter."

52.      On April 23, 2015, Jeff Smisek, United's Chairman, President and CEO stated, "United has been the industry leader in capacity discipline, and as we have shown in the past, we will take the appropriate actions to ensure we are matching capacity with demand."

**Southwest:**

53.      On April 25, 2013, Gary Kelly, Chairman, President, & CEO of Southwest stated, "We're going to be disciplined. We're going to manage our capacity."

54.      On April 24, 2014, Southwest's Tammy Romo, Senior Vice President, Finance and Chief Financial Officer, stated, "We continue to have a disciplined growth strategy with flat year-over-year [available seat miles] capacity in 2014."

55.      On January 22, 2015, in response to a question from Jack Nicas, a *Wall Street Journal* reporter, about whether the windfall from cheaper fuel would lead to airlines adding capacity, Mr. Kelly responded, "With respect to our capacity plans, again, I think we've been

very clear this morning to say that we're really not changing our business plan for 2015 with respect to those kinds of topics."

**American:**

56.     On January 27, 2015, American's Executive Vice President and Chief Financial Officer, Derek Kerr, stated, "There has been a lot of talk of capacity changes in response to lower fuel prices. You won't see any changes from us in the near future since we continue to run the Airline as though high fuel prices will return."

57.     During the June 7-9, 2015 International Air Transport Association ("IATA") annual meeting held in Miami, top airline executives discussed ways to limit flights and seats on routes in order to maintain higher prices and profit margins.

58.     In an article entitled "Discipline for Airlines, Pain for Fliers" published on June 11, 2015, *The New York Times* reported:

> At this week's meeting in Miami of the International Air Transport Association, the annual meeting of the world's top airline executives, the buzzword was "discipline." Here is Delta Air Lines' president, Ed Bastian: Delta is "continuing with the discipline that the marketplace is expecting." Air Canada's chief executive, Calin Rovinescu: "People were undisciplined in the past, but they will be more disciplined this time." And American Airlines' chief, Doug Parker, said the airlines had learned their lessons from past price wars. "I think everybody in the industry understands that," he told Reuters.''

> "When airline industry leaders say they're going to be 'disciplined,' they mean they don't want anyone to expand capacity," said Fiona Scott Morton, professor of economics at Yale and a former deputy attorney general in the antitrust division of the Justice Department. "And when there aren't enough seats, airlines raise prices. That's what we've been seeing."

59.     *The New York Times* went on to report that Defendants' capacity discipline was working and profits were at a record high:

> Got the message? "Discipline" is classic oligopoly-speak for limiting flights and seats, higher prices and fatter profit margins. This year, that discipline seems to be

working: the I.A.T.A. projected this week that airline industry profits would more than double this year to nearly $30 billion, a record.

60.    In May 2015, Southwest's chief executive, Gary C. Kelly, said the airline was going to expand capacity this year by as much as eight percent, with the expansion spilling over into 2016. But, after coming under fire at the IATA meeting, Southwest quickly moved to reassure investors it wasn't going rogue. "We have taken steps this week to begin pulling down our second half 2015 to manage our 2015 capacity growth, year-over year, to approximately 7 percent."

61.    The airline mergers have facilitated the Defendants' agreement on capacity constraints. In May 2010, United and Continental announced their planned merger. The announcement caused speculation about the future of each airline's hubs, including Continental's Cleveland hub. In Congressional testimony, an industry analyst stated that he did not believe the merger would cause reductions in Cleveland. On June 18, 2010, upon seeing the testimony, US Airways' CEO wrote an email to other US Airways executives stating, "Surely these guys [United/Continental] aren't really planning to keep Cleveland open. I'm hopeful they're just saying what they need to (including to [the analyst]) to get this approved." United and Continental closed their deal on October 1, 2010. The combined firm has reduced capacity at nearly all its major hubs (including Cleveland) and at many other airports where the two airlines previously competed.

62.    Similarly, Southwest/AirTran reduced service in a number of its focus cities and on many of AirTran's former routes following the 2011 merger.

63.    US Airways was interested in its merger with American because US Airways' senior executives were concerned that American was about to embark on a growth plan that would disrupt the industry's capacity discipline.  US Airways believed that, if American

implemented its growth plans, which included placing "the largest order for new aircrafts in the industry history," other airlines would "react to [American's] plans with their own enhanced growth plans destabilizing the industry." US Airways believed that American's standalone capacity growth would "negatively impact" industry revenues and threaten industry pricing.

64.     Defendants' agreement on capacity discipline has achieved its intended result of maintaining or increasing customers' fares and thereby increasing Defendants' revenues and profits.

65.     Available Seat Miles (ASM), the number of seats offered multiplied by the number of scheduled miles flown, is a typical measure of capacity in the airline industry.  As indicated in Table 2 below, since 2010, available seats offered by the legacy airlines have increased at rates that are significantly below the growth in ASM exhibited by smaller domestic carriers:

**Table 2: Domestic Available Seat Miles**

**(millions)**

|  | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|
| *Legacy Airlines* |  |  |  |  |  |
| American | 93,174 | 91,630 | 89,849 | 89,264 | 89,425 |
| Continental | 48,797 | 50,725 | - | - | - |
| Delta | 110,096 | 108,783 | 108,774 | 111,667 | 116,478 |
| United | 67,521 | 62,314 | 110,625 | 108,407 | 107,273 |
| US Airways | 52,702 | 53,152 | 54,504 | 57,388 | 58,647 |
| Southwest | 121,571 | 127,334 | 126,278 | 127,776 | 128,413 |
| **Total** | 493,861 | 493,938 | 490,030 | 494,501 | 500,236 |
| **Legacy % change** |  | 0.02% | -0.79% | 0.91% | 1.16% |
| *Other Airlines* |  |  |  |  |  |
| JetBlue | 29,586 | 31,556 | 33,610 | 35,536 | 35,986 |
| Frontier | 10,284 | 11,411 | 10,487 | 9,439 | 10,997 |
| Virgin America | 7,648 | 9,512 | 12,053 | 11,890 | 11,916 |
| Alaska | 22,581 | 24,291 | 26,003 | 28,139 | 30,180 |
| Hawaiian | 8,975 | 9,008 | 9,921 | 10,414 | 11,216 |
| Allegiant | 6,040 | 6,159 | 7,292 | 8,000 | 8,806 |
| **Total** | 85,114 | 91,937 | 99,367 | 103,417 | 109,102 |
| **Other % change** |  | 8.02% | 8.08% | 4.08% | 5.50% |

66.     Accordingly, Defendants' airfares have substantially increased and stabilized since 2009, despite decreases in fuel costs since 2012, as shown in Figure 3 below:

**Figure 3: Annual U.S Domestic Average Itinerary Fare**

**(Constant USD)**



67.     Capacity discipline has also led to higher fees charged by airlines. The airline industry has increasingly charged consumers fees for services that were previously included in the price of a ticket. These so-called ancillary fees, including those for checked bags and flight changes, have become very profitable. In 2012 alone, airlines generated over $6 billion in fees for checked bags and flight changes. In 2013, Defendants generated more than $12 billion in ancillary revenue.

68.     As a result of their agreement on capacity, Defendants have earned record profits. In the past two years alone, United States airlines earned a combined $19.7 billion.

69.     Following the publication of *The New York Times* article on the IATA meeting, on June 17, 2015, Senator Richard Blumenthal of Connecticut sent a letter to the United States Department of Justice ("DOJ"). Citing *The New York Times* report and statements in the DOJ's complaint to block the 2013 American and US Airways merger, Senator Blumenthal "urge[d] the Antitrust Division to conduct a full and thorough investigation of anticompetitive, anti-consumer conduct and misuse of market power in the airline industry, evidenced by recent pricing patterns as well as remarks made at the IATA conference."

70.     Senator Blumenthal's letter came on the heels of similar concerns expressed by Senator Charles Schumer from New York who, in December 2014, called for a federal investigation into U.S. airfares amidst falling gas prices, stating:

> "At a time when the cost of fuel is plummeting and profits are rising, it is curious and confounding that ticket prices are sky-high and defying economic gravity," Schumer said in a statement. "So I'm urging the feds to step in and do a price investigation on behalf of consumers who must buy holiday travel tickets that can break the bank."

> "The industry often raises prices in a flash when oil prices spike, yet they appear not to be adjusting for the historic decline in the cost of fuel; ticket prices should not shoot up like a rocket and come down like a feather," he said. "That is why I urge the DOJ and DOT to immediately investigate why airline profits are not more efficiently being passed down to consumers."

**C.     The DOJ Issued Civil Investigative Demands ("CIDs") to All Four Defendants**

71.     On July 1, 2015, the DOJ confirmed that it was conducting an antitrust investigation into the airline industry to determine whether some airlines are colluding in reducing capacity and slowing their rate of growth in an effort to command higher airfares. All four Defendants confirmed receipt of the CID and stated they were cooperating with the DOJ.

72.     According to the Associated Press, the CID requested the following information:[1]

a)      Tell us who in your company sets the communications strategy to shareholders, investors or analysts and who does that communication.

b)      Give us any documents "discussing (a) the need for, or the desirability of, capacity reductions or growth limitations by the company or any other airline; or (b) the undesirability of your company or any other airline increasing capacity."

c)      Give us any of your documents that talk about changes in your capacity or that of your competitors.

d)      Give us any communications between you and outside parties about your capacity or that of your competitors and how capacity changes affect fares, revenues or profits.

e)      Tell us the time and place of any conference, meeting or appointment, including telephone calls, you have involving industry analysts (we want your appointment books, day planners, calendars, etc., as well as any materials preparing for such contacts).

f)      Tell us the time and place of any conference, meeting or appointment, including telephone calls, you have had involving other airlines in which capacity was discussed (we want your appointment books, day planners, calendars, etc., as well as any materials preparing for such contacts).

g)      We want to know everybody who owns at least 2 percent of your company, including the time that person owned that much of your company.

h)      Concerning those people who owned at least 2 percent, tell us about all your meetings, appointments or conference with those people in which industry capacity was discussed. We want to see any calendars, appointment books, day planners, etc., that were involved, as well as any documents prepared for those discussions and which talked about those discussions afterward.

i)      We want to know how much capacity you flew, in available seat miles, every month since January 2010, and please include the seat miles flown by your regional partners as well.

j)      Spell out your document retention policy including emails.

---

[1] http://aviationblog.dallasnews.com/2015/07/ap-justice-is-looking-into-airline-collusion-on-holding-down-capacity.html/

k)      Tell us who is preparing this information and submitting it to us. If someone gives that preparer some oral instructions, tell us who gave the oral instructions and what he and she said.

## VIII.   PLAINTIFF AND THE CLASS SUFFERED ANTITRUST INJURY

73.     Defendants' conspiracy had the following effects, among others:

a.      The prices of domestic air passenger transportation services have been fixed, raised, maintained, or stabilized at artificially inflated levels; and

b.      Direct purchasers of domestic air passenger transportation services have been deprived of free and open competition.

74.     During the Class Period, Defendants charged supracompetitive prices for domestic air passenger transportation services sold to plaintiff and the Class. By reason of the alleged violations of the antitrust laws, plaintiff and the Class have sustained injury to their business or property, having paid higher prices for domestic air passenger transportation services than they would have paid in the absence of an illegal contract, combination, or conspiracy, and, as a result, have suffered damages in an amount presently undetermined. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## IX.   CLAIM FOR VIOLATION OF SHERMAN ACT § 1

75.     Defendants entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

76.     The acts done by each of the Defendants as part of, and in furtherance of, their contract, combination, or conspiracy were authorized, ordered, or done by their high-level officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

77.     The anti-competitive acts were intentionally directed at the United States market for domestic air passenger transportation services and had a substantial and foreseeable effect on

interstate commerce by raising and fixing domestic air passenger transportation services prices throughout the United States.

78.     Defendants' anti-competitive activities have proximately caused injury to plaintiff and the Class in the United States.

79.     As a direct and proximate result of the contract, combination, or conspiracy among Defendants alleged in this complaint, the prices charged to plaintiff and the Class for domestic air passenger transportation services were unlawfully raised, fixed, maintained, or stabilized in the United States.

80.     The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

81.     The contract, combination, or conspiracy had the following direct, substantial and reasonably foreseeable effects upon commerce in the United States and upon import commerce:

     a.     Prices charged to plaintiff and the Class for domestic air passenger transportation services were raised, fixed, maintained, or stabilized at supra-competitive levels;

     b.     Plaintiff and the Class have been deprived of the benefits of free, open, and unrestricted competition in the markets for domestic air passenger transportation services; and

     c.     Competition in establishing the prices paid for domestic air passenger transportation services has been unlawfully restrained, suppressed, or eliminated.

82.     As a direct and proximate result of Defendants' unlawful conduct, plaintiff and the Class have been damaged in their business or property by paying prices for domestic air passenger transportation services that were higher than they would have been but for Defendants' unlawful conduct resulting in an amount of ascertainable damages to be established at trial.

## X.     __PRAYER FOR RELIEF__

**WHEREFORE,** Plaintiff prays that:

A.     The Court determine that this action may be maintained as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

B.     The unlawful contract, combination, or conspiracy alleged herein be adjudicated and decreed to have been in violation of Section 1 of the Sherman Act;

C.     Joint and several judgments be entered for plaintiff and the Class against Defendants for three times the amount of damages sustained by plaintiff and the Class as allowed by law, together with the costs of this action, including reasonable attorneys' fees; and

D.     Plaintiff and the Class be granted such other, further, and other relief as the case may require or as the Court may deem just and proper under the circumstances.

## XI.     __JURY DEMAND__

Pursuant to Federal Rule of Civil Procedure 38(b), plaintiff demands a trial by jury.

Dated:      New York, New York
             July 13, 2015

Respectfully submitted,

**FRANK & BIANCO LLP**

By:   /s/ Gregory A. Frank     
         Gregory A. Frank (GF 0207)
Marvin L. Frank (MF 1436)
Bridget V. Hamill (BH 0207)
Asher Hawkins
275 Madison Avenue, Suite 705
New York, New York 10016
Tel: (212) 682-1853
Fax: (212) 682-1892
info@frankandbianco.com


Attorneys for Plaintiff and the Class